Harold **LASKY**, Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

**Civ. Nos. 571–73 and 708–72.**

United States District Court,
D. Puerto Rico.

Feb. 4, 1975.

Pedro E. Purcell Ruiz, Santurce, P. R., for plaintiff.

Jose A. Anglada, Asst. U. S. Atty., Old San Juan, P. R., for defendant.

Carmelo Calzada Matta, Agustin R. Hernandez, Rio Piedras, P. R., for intervenors Enrique Carrillo Romero Enrique Tomas Carrillo Pagan Jorge Lucas Carrillo Pagan.

## MEMORANDUM OPINION

FERGUSON, District Judge, Sitting by Designation.

The relevant facts in these cases are as follows:

1. Plaintiff Harold Lasky in 1969 purchased from a private party land on the Puerto Rican island of Culebra. The parcel is known as Punta Tampico. Although he received a deed, and was able to recite a chain of title in various private parties going back some thirty years, the title was not recordable.

2. In 1971, he petitioned the Superior Court of the Commonwealth of Puerto Rico to record the title for him. The petition was pursuant to 30 L.P.R.A. § 737,[1] a statute which creates a deminion title hearing through which a court may decree a recordable title if the party can show his ownership of the property.

3. Prior to any final disposition of the petition, the United States moved to be recognized as an intervenor in the action, claiming ownership of the property to which Lasky sought title. The Superior Court granted the motion.

4. The United States then removed the cases to this court.

---

[1]. The relevant parts of 30 L.P.R.A. § 737 state:

§ 737. Record of ownership without recordable title

Any owner of property having no recordable title of ownership whatever the period of the acquisition may be, may record such ownership upon proving it under the following formalities:

1. He shall submit to the part of the Superior Court of the territory in which the property is situated or to the one of the district in which the larger portion thereof is situated, if the estate be located in more than one territorial demarcation, a statement of the manner in which he acquired it and any legal proof of such acquisition which he may have to offer, and praying that, after citation of the person from whom the property may have been acquired, or of his predecessor in interest, and of the public prosecutor, such evidence be admitted and a declaration of his rights made.

2. The Court shall refer this petition to the public prosecutor and to the Puerto Rico Planning Board, shall cite the person from whom the property was acquired or his predecessor in interest, if known, and the persons who may have any property right in said real property, and shall summon the unknown persons who might be prejudiced by the record applied for, by means of edicts to be published thrice for a period of fifteen days in a daily newspaper of general circulation in the Island of Puerto Rico, in order that they may appear if they wish to assert their rights.

If the persons to be cited should be absent from Puerto Rico and their whereabouts is known, they shall be summoned through edicts published as stated in the preceding paragraph, and at the time of the first publication of the edict, a copy thereof shall be sent to them by registered mail to their known address. If their whereabouts is unknown they shall be summoned through edicts published as prescribed in the first paragraph of this subdivision.

Within the term of forty days from the date of publication of the last edict, excluding the day of publication, the summoned interested persons, the public prosecutor and the representative of the Planning Board, shall appear before the Court, in order that they may assert their rights.

\* \* \* \* \*

3. Upon expiration of said term . . . the court shall hold a hearing on the claims to receive evidence, hear the public prosecutor, the representative of the Planning Board, and any other persons appearing; and in view of their allegations and appraising the evidence rationally, shall decide whether or not the ownership of the property involved has been established.

4. The public prosecutor or any of the persons interested may appeal from this decision; and should they do so, the appeal shall be heard and decided according to the procedure established in the Code of Civil Procedure.

5. If said decision is accepted or affirmed, it shall constitute a sufficient title for the record of the ownership.

The government moved for summary judgment, asserting that various laws and treaties of the United States make it legally impossible for plaintiff to prevail in his assertion of dominion over the property. The relevant treaty is that between Spain and the United States, signed in Paris in 1898 at the end of the Spanish-American war. One of its provisions was that all public lands in Puerto Rico formerly held by Spain would become the property of the United States.[2]

The government asserts that the land claimed by Lasky is part of this public land ceded to the United States in 1898. To support its claim, it has produced a Navy map of Culebra which was traced directly from an 1887 Spanish map of the lot lines on Culebra. Lots 1–80 were in private hands at the time of the treaty, and remained so afterwards. Lots numbered 81 and above were in the public domain, and passed to the United States. The map shows that none of the lots in private hands extended all the way to the coast line, and that wherever there was any kind of peninsula, all of it was reserved to the public domain. Punta Tampico is clearly shown as one such peninsula.

There can be no doubt that Punta Tampico belonged to the United States in 1898. The next question is whether the government has retained that ownership. A proclamation by President Theodore Roosevelt in 1903[3] placed all public lands on Culebra under the control of the United States Navy. The Commonwealth of Puerto Rico has recognized the United States' ownership, granting tax exempt status to Punta Tampico.

It would appear, therefore, that plaintiff can succeed in his dominion title ac-tion only if some occurrence has legally divested the United States of its otherwise clear ownership. Plaintiff conceded at oral argument that adverse possession could only be claimed against private parties asserting an interest in the land.

Plaintiff's only basis for overturning the government's title would be through his implicit argument that the government is estopped from asserting its title since some of its officers have allegedly stated that it did not own the land. He claims that prior to "purchasing" the land, he went to the Navy station in Culebra, and asked whether the Navy had any legal interest in the land. He says that he was shown a map that showed no claim, and was told that the land was free of any government ownership. He also submits a letter from an Admiral of the Navy, stating that the Navy has no interest in the lands in and around Punta Tampico (with the exception of two parcels, not at issue here). This letter was written five years before plaintiff's purchase, and was in regard to a totally different matter, not involving plaintiff. There is no indication that plaintiff was aware of its existence at the time of his purchase.

In Utah Power and Light Co. v. United States, 243 U.S. 389, 37 S.Ct. 387, 61 L.Ed. 791 (1917), the Supreme Court said:

> "As a general rule, laches or neglect of duty on the part of officers of the government is no defense to a suit by it to enforce a public right or protect a public interest. . . .
>
> A suit by the United States to enforce and maintain its policy respecting lands which it holds in trust for all the people stands upon a different

---

2. Article VIII of the Treaty of Paris says in part:

"In conformity with the provisions of Articles I, II and III of this treaty, Spain . . . cedes in Puerto Rico . . . all the buildings, wharves, barracks, forts, structures, public highways and other immovable property which, in conformity with law, belong to the public domain, and as such belong to the Crown of Spain."

3. 33 Stat. 2314.

plane in this and some other respects from the ordinary private suit to regain the title to real property or to remove a cloud from it." [citations omitted] 243 U.S. at 409, 37 S.Ct. at 391.

This rule has continuing vitality today. INS v. Hibi, 414 U.S. 5, 94 S.Ct. 19, 38 L.Ed.2d 7 (1973). In the course of that opinion, the Court referred to an earlier decision which left open the possibility that there might be some kind of misconduct by government officers which would estop the government. See Montana v. Kennedy, 366 U.S. 308, 314–15, 81 S.Ct. 1336, 6 L.Ed.2d 313 (1961). But it found no such misconduct in *Hibi*, in spite of what the dissent referred to as "deliberate—and successful —effort on the part of agents of the Executive Branch to frustrate the congressional purpose and to deny substantive rights . . . ." 414 U.S. at 11, 94 S.Ct. at 23 (Douglas, J., dissenting). The majority's finding would seem to indicate that only the most outrageous official conduct will give rise to an exception to the *Utah Power* rule.

Certainly there was no such conduct here. The Navy officers possibly were negligent in their replies to plaintiff's question about Punta Tampico, but the whole thrust of *Utah Power* is that such simple negligence alone can't be allowed to frustrate the government's right to utilize public resources for the public weal. The Admiral's letter speaks for itself as a misstatement of facts, but there was no assertion by plaintiff that he knew of, or relied on, this letter when buying Punta Tampico. Without such an allegation, there can be no claim of estoppel.

In sum, the government has conclusively shown Navy control and United States ownership of what were once Spain's public lands on Culebra, including Punta Tampico. Plaintiff has been unable to assert any facts or theories which could legally establish his title to Punta Tampico. The government's motion for summary judgment will therefore be granted.